MARY DICKINSON, RESPONDENT, v. ABERNATHY FURNITURE COMPANY, APPELLANT.—96 S. W. (2d) 1086.

Kansas City Court of Appeals. June 15, 1936.

*Schultz & DeMaria* and *Charles V. Benanti* for respondent.

*Cooper, Neel, Kemp & Sutherland* and *Frank J. Rogers* for appellant.

REYNOLDS, J.—This is an action to recover damages for personal injuries alleged to have been received by plaintiff from being hit by a truck belonging to defendant, when she was crossing a public street in Kansas City, Missouri.

The petition alleges that, on September 29, 1933, plaintiff was walking north on the east side of Troost Avenue, across Seventeenth Street, when she was struck and injured by a truck belonging to defendant, which truck had approached from the north on Troost Avenue and was making a left turn off of Troost Avenue into Seventeenth Street.

The negligence charged is failure to keep a reasonable, vigilant lookout ahead and laterally; violation of the humanitarian rule;

violation of the ordinances of Kansas City, Missouri; failure to give any warning or signal of the approach of said truck; and operation of the same at a high and dangerous rate of speed. Damages are prayed for in the amount of $7500.

Defendant's answer is a general denial and a plea of contributory negligence.

Plaintiff submitted her cause solely under the humanitarian doctrine, upon defendant's alleged failure to slacken the speed of his truck or stop the same.

There was a jury verdict of $1500, and judgment was rendered thereon. From such judgment, defendant has perfected its appeal to this court.

There was evidence tending to show the following facts: Plaintiff a negress, was, at the time of the injuries complained of, thirty years of age and lived at 910 East Seventeenth Street, Kansas City, Missouri. Troost Avenue is a street in Kansas City, Missouri, which runs east and west; and there are double street car tracks on Troost Avenue and a paved sidewalk on its east side, some eight or ten feet in width. On September 29, 1933, plaintiff alighted from a northbound Troost Street car, which stopped on the south side of Seventeenth Street, and walked east to the sidewalk on the east side of Troost and turned north to the southeast corner of the intersection with Seventeenth Street to cross Seventeenth Street. As she reached the southeast corner, she looked for approaching vehicles; and, while she was on the sidewalk and before she stepped into the street, she saw defendant's truck coming south on Troost Avenue and approaching Seventeenth Street. The truck was then about one hundred feet north of Seventeenth Street. There was no other vehicle in or near the intersection. The northbound street car had started forward and was proceeding across the intersection as she was on the sidewalk. She was near the center of the sidewalk, facing north; and, as the street car was crossing the intersection, she left the sidewalk and walked a distance of about seven or eight feet into the street, when she observed this truck cutting the corner and making a left turn in the rear of the street car, to proceed east into Seventeenth Street. The truck was approaching her; and, immediately upon her noticing this truck make the left turn and approach the place where she was, plaintiff turned and tried to get back to the sidewalk; but, before she could reach a place of safety and when she was near the south curb of Seventeenth Street, some part of the right side of this truck struck her right side; and she fell toward the south. The truck, at the time, was traveling about fifteen to twenty miles per hour. There was no horn sounded at any time. Plaintiff had no notice of the intention of the driver to turn the truck into Seventeenth Street. As the truck was coming south on Troost, it was straddling the west rail of the southbound

car track. The distance from the point where the truck started to turn east to the point where plaintiff left the sidewalk was about twenty-five to thirty feet. The truck was stopped within fifteen to twenty feet after striking plaintiff. The truck driver had a clear vision ahead; and, as he was turning left, there was no obstruction whatever to prevent him from seeing the plaintiff. The collision occurred in the morning. As the truck struck her, she fell to the south; and a negro, who was behind her, caught her before she hit the pavement. She was then helped across the street to the north side. While she was there, the truck driver came to her and inquired if he had struck her and took her name and address. As she stood there, she was in pain and felt weak, and she asked to be permitted to rest for a while. She was then helped to her home and placed in bed. Her neighbors were called in, and some tenant in the building where she lived called Dr. Miller, a negro doctor. She complained to Dr. Miller of pain and told him that the truck struck her right side. The doctor testified that he examined her; that he found no enlargement, bruises, scratches, or abrasions on her body indicating that she had been struck but she complained of her right side hurting; that he palpated her at such point and she flinched and gave evidence of suffering pain; and that he rubbed her right side and then taped her side with adhesive and gave her medicine to relieve her pain. About five or six days after the accident, she called Dr. Jerowitz; and she was under his care and treatment for about two months. During those two months, she suffered severe pain in her back and her right side. She was confined to her bed most of that time. Dr. Jerowitz found tenderness in the region of the right lower ribs and in the back over the kidneys, with rigidity of the muscles in the back, and found evidence of internal injuries. He prescribed heat and gave her medicine for internal use. He treated her every two or three days until November, 1933. He continued to see her as late as February, 1935. It was the opinion of the doctor that the tenderness in her back and the rigidity of the muscles of her back were permanent. Plaintiff, prior to this accident, was active, was employed for a number of years doing housework, and had not had an injury to her back.

There was evidence tending to show that the plaintiff had previously been in the hospital, where she had been treated for various disorders and ailments, and that she had suffered with pain in the knees and in the back of her neck and her side and that, a short while previous to the collision of September 29, 1933, she had been struck by an automobile on a crossing; but there was no evidence that she sustained other than slight injury, if any, therefrom.

There was also evidence by the driver of the truck to the effect that plaintiff was not struck by his truck on the morning of September 29, 1933; that, as he made the turn into Seventeenth Street, he saw the plaintiff step or jump off the sidewalk and stopped his truck;

that she went around, back of it, and over to the northeast corner of Seventeenth and Troost, talking to herself about something; that he stuck his head out of the car window and said to her, "I didn't touch you," and she answered, "Why, yes, you did;" that he then got out of his truck and went over to her and got her name; that he tried to find out where he had hurt her but she could not tell him. He testified that the front of his truck, at the time he stopped it, was about two feet east of the sidewalk (had the sidewalk been extended across Seventeenth Street) and that the right side of his truck was about three feet from the curb line on Seventeenth Street; that, before he stopped his car, he swerved it to the left and saw the plaintiff at the time that he swerved; that the tail gate of his truck was down and probably extended out on Troost Avenue when he stopped; and that his truck never touched plaintiff. There was also evidence tending to show that plaintiff, since being struck by defendant's truck, has suffered constant pain in her back and in the region of her kidneys; that she suffers from frequent urination to the extent that she is required to get up at night as often as ten or fifteen times; that, prior to being struck, she had never suffered any kidney disorder and she had never been bothered with frequent urination; that, she had not suffered any pain or injury to her back previous to being struck. There was further evidence tending to show that plaintiff's natural rest and sleep are impaired; that she suffers constant pain in her right side where the truck struck her; that she is weak; that she, at the time she was struck, was thirty years of age and for nine years had been doing all kinds of housework; and that, prior to the time she was struck, she had contracted an infection of the blood and had received treatment therefor from Dr. Guggenheim at the city hospital.

At the close of plaintiff's case and again at the close of all of the evidence, defendant requested instructions in the nature of demurrers, which were denied.

## Opinion.

1. The first point made by defendant on this appeal is that the trial court erred in refusing to give its requested instruction in the nature of a demurrer at the close of all of the evidence, in that there was not any proper and sufficient evidence to warrant a verdict and that the evidence introduced by plaintiff was not of any probative force and was contrary to the physical facts and insufficient to warrant the submission of the cause.

Defendant insists that the accident could not have happened as plaintiff says that it did; that it was physically impossible for it to have happened so; and that plaintiff's testimony is against all reason and experience.

2. While there may have been some inaccuracies and seeming vagueness in the testimony of plaintiff and her witnesses as to the speed

of defendant's truck and the character of the turn from Troost Avenue into Seventeenth Street by defendant's driver of said truck and that part of defendant's truck by which plaintiff was struck and her exact position when she was struck and the way she fell and her injuries, we, nevertheless, take it that, from all of the evidence in the record including that of defendant's driver, defendant's truck did come south down Troost Avenue, straddling the west street car rail of the double track on such street, and that it did make a left turn at the intersection of Seventeenth Street with Troost Avenue and did proceed to start east on Seventeenth Street; and that such turn was so hurriedly and abruptly made as to throw the truck almost into the curb on the south side of Seventeenth Street at the crossing, where the sidewalk would have been had it been extended, and at or near the point where plaintiff claims to have been struck and injured. The driver of the truck testified that he came within about three feet of the curb at such point. There is no evidence in the record that we have been able to discover given by plaintiff to the effect that, as defendant's driver came down Troost Avenue with the truck, it was traveling at twenty-five or thirty miles per hour. The only evidence given by plaintiff with reference to the speed at which the truck was traveling was that it was coming from fifteen to twenty miles per hour after it turned to come into Seventeenth Street and came toward her. The evidence is that it came across the intersection and made the turn into Seventeenth Street in the rear of the northbound street car, passing the intersection at that time. The record does not show that plaintiff testified that the truck came the distance from where she first observed it, one hundred feet north of the north curb of Seventeenth Street, and made the left turn around the street car and then proceeded east across Troost to the sidewalk while she was traveling a distance of only seven or eight feet or three or four steps. She said that she was on the sidewalk when she first observed the car one hundred feet north of the north curb of Seventeenth Street, coming down Troost Avenue. She stepped off of the sidewalk to cross over Seventeenth Street after the northbound street car, from which she had alighted on the south side of Seventeenth Street, had started to cross over the intersection; and she had gone only seven or eight feet when she observed the defendant's truck making the left turn on the intersection, coming toward her; and she turned to get back to the sidewalk. Of course, her statement that the truck was one hundred feet north of the curb line when she first saw it is to be taken as her estimate of the distance, which may or may not have been accurate, as likewise her statement with reference to the speed of fifteen or twenty miles at which she stated the truck was approaching her as it made the left turn coming around the rear of the street car. We are not at liberty to reject her testimony because of mere inaccuracies therein in the face of the record in this case, which shows that the

truck did come from the north of the intersection and did turn in the rear of the northbound car on the intersection and did proceed east on Seventeenth Street to where plaintiff was and did strike her.

3. Defendant insists that, if plaintiff had been struck by the truck as she testified she was, it would have struck her with such force and violence that she would have been hurled to the pavement and that there would have been bruises and abrasions and other positive evidence on her person that she had been struck. That is not necessarily true. There is no evidence as to how the plaintiff was dressed or what clothing she had on her person, nor is there any claim by her that she was struck with great force and violence, but there is evidence that she was carrying with her a bundle of clothing. Her claim is that the truck made a sweeping curve and that something on the side thereof struck her on her side as it passed. It is entirely possible that she may have received such a blow without being hurled violently to the pavement or without any external evidence having been given of her being struck. She testified that she was struck hard enough to knock her over and that she was caught by some one standing near and never hit the pavement.

4. Defendant further insists that plaintiff could not have been struck by the side of the truck as she stated but necessarily must have been hit by the front of the truck, if at all, and argues that it is a matter of general knowledge that, in making a left turn, the extreme right corner of an automobile is the point extending farthest to the right. That may be true sometimes but not necessarily always. The automobile may make such a quick, short, and rapid turn as to throw the rear thereof around beyond the farthest point that the front end may have reached. Again, the front end might have passed plaintiff before the turn was started to be made, and the rear end might have been jerked around against plaintiff by the abruptness of the turn. There is no fixed rule, so far as we know, by which the antics of a truck, when in operation, are to be accurately analyzed and described. Many things of an accidental nature happen that are seemingly inexplicable. The fact remains, however, that they happen.

5. Defendant contends again that it was impossible, from plaintiff's position at the time that she claims to have been struck, that she should have been struck on her right side. True, she said she was facing south, trying to get back to the sidewalk at the time that she was struck, and that she was struck on on her right side; but, we may make allowance for the fact that, under a situation of stress, one can not always be accurate as to exact positions. That she was struck and struck on the right side by the truck as it was making a sweeping turn to the left cannot be doubted under the evidence in the record. The jury so found. The quick turn of the front end of the truck to the left or to the north may have thrown the rear of the truck squarely against her right side, even as she faced south.

6. Defendant further says that it was highly improbable and practically impossible for plaintiff to receive a blow that would cause the severe internal condition complained of by her without evidence of such blow on the surface of her body. Such may be true but not necessarily at all times. It would depend on the character of the blow, the force with which she was struck, the clothing she had on her person at the point where she was hit, or something she might have been carrying that was over such point and that may have protected it. It was not shown how she was dressed or what clothing she had on her person at the time; but it is, of course, to be assumed that she was dressed. She could have had a heavy corset on, or it may have been that the bundle of clothing which she was carrying was under her right arm and protected the place where she was struck.

7. Defendant argues again that the bed of the truck was five feet off the ground and that plaintiff could not have been struck on her side, as she testified, but must have been hit, if at all, about her head and shoulders. There is no claim in plaintiff's testimony that she was hit by the bed of the truck. She says that she does not know what part of the truck hit her, that it was somewhere on the side, in rear of the front end and near the cab. There was other evidence that she was struck by the fender, which was farther down on the truck than the bed thereof.

8. Defendant says that the evidence of Stevens, one of the witnesses for plaintiff, was unbelievable and was physically impossible. It assumes for this purpose that the truck was between the witness and plaintiff at the time she was struck and that such witness could not see by what part of the truck she was struck. The witness testified that defendant's truck was making a sweeping turn and that the upper part of the right fender thereon came in contact with plaintiff. He further testified that, in making its sweeping turn, the front part of the truck was directed toward where he was standing and that he could see along the right side thereof. Defendant's driver also testified that, to escape plaintiff, he swerved his truck toward the left and that, by doing so, the front of his car was near the center of the street when he stopped and the tailboard thereof was out in Troost Avenue. This corroborated the statement of Stevens, that the position of the car was such that he could see from where he was standing along the right side thereof.

9. It is true that it has been repeatedly ruled by the Appellate Courts of this State that, when the testimony of a witness respecting a material issue of fact is wholly at variance with the physical facts or in derogation of the immutable laws of physics or when such testimony is inherently impossible and unbelievable or the inferences deducible therefrom are so opposed to all reasonable probabilities as to be manifestly false, the courts are not obliged to stultify them-

selves by giving credence or weight thereto. Nevertheless, as aptly stated in 10 R. C. L. sec. 198, pp. 1008-9, "It requires an extraordinary case to authorize the court to regard sworn testimony as manifestly impossible and untrue. . . . So frequently do unlooked-for results attend the meeting of interacting forces that courts should not indulge in arbitrary deductions from physical law and fact except that when they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other." [Schupback v. Meshevsky (Mo.), 300 S. W. 465.]

The rule seems to be and, upon principle, should be that the testimony of a witness may be rejected upon the legal conclusion that such testimony is opposed to physical law only when such legal conclusion is so clear and irrefutable that no room is left for the entertainment by reasonable minds of any other conclusion. [Kibbe v. Quincy, O. & K. C. R. Co., 285 Mo. 603, 227 S. W. 42.]

As a general rule, the credibility of witnesses and the truth of their testimony are for the determination of and within the exclusive province of the jury. [Holzemer v. Metropolitan Street Ry. Co., 261 Mo. 379, 169 S. W. 102; Steele v. Kansas City Southern R. Co., 302 Mo. 207, 257 S. W. 756.]

In Doyle v. St. Louis Merchants' Bridge Terminal Railway Company, 326 Mo. 425, 31 S. W. (2d) 1010, l. c. 1012, the Supreme Court, in affirming a judgment for plaintiff and in holding that plaintiff's evidence was not contrary to physical facts and unbelievable said: "We cannot say as a matter of law that plaintiff's history of the manner of the occurrence was untrue or impossible. We know from common knowledge that inexplicable happenings do occur. Unless we can say that the evidence was opposed to the immutable laws of physics, we cannot declare it to be fiction. We cannot say that the evidence lacked weight or credence. The courts are reluctant to say that declared facts are manifestly impossible or untrue."

In this case, it cannot be said that the testimony of plaintiff and her witnesses is opposed to the immutable laws of physics and is incapable of belief; but, upon the other hand, it possesses probative force and is sufficient for the submission of plaintiff's cause to the jury and to support the verdict rendered by the jury in her favor.

Defendant's request for a peremptory instruction in the nature of a demurrer was properly denied by the trial court.

10. Defendant next complains that the verdict of the jury is excessive and that there is no evidence upon which to base an award for damages. That there is no evidence upon which to base an award for damages has been disposed of adversely to defendant's contention by what has been said approving the action of the trial court in refusing defendant's requested instruction in the nature of a demurrer.

While there was no evidence that plaintiff suffered from bruises, cuts, abrasions, swellings, or other injuries appearing upon her body,

yet there was evidence tending to show that she suffered internal injuries of a permanent nature, by reason of being struck by defendant's truck, as a result of which she suffered immediate, severe pain in her side and became weak, nervous, and sick. She had to be assisted home, and there she was placed in bed. Dr. Miller was called and massaged her side and strapped the parts with adhesive tape and gave her medicine for internal injuries. She complained of pain in her side. He palpated her at such point; and she flinched, which indicated that her complaint was genuine. Dr. Jerowitz was thereafter called on October 4, 1933, and took charge of her case. He testified that he found that she was suffering from tenderness in her back in the region of her kidneys and from rigidity of the muscles in the back and tenderness in the abdomen; that he found evidence of internal injuries; that, when he called, she was confined to her bed and continued to be so confined until the early part of December; that, during the month of November, she was very ill and developed peritonitis and pelvic inflammation. From the first part of her illness until November 6, he attributed the rigidity of her muscles and her painful condition to an internal injury. On that date, she developed a high fever. He felt that her symptoms were aggravated by a previous condition. The doctor testified that, in his opinion, the conditions in her back causing pain and rigidity of the muscles were permanent. The plaintiff testified that, since being struck by defendant's truck, she has suffered constant pain in her back and in the region of her kidneys; that she suffers from frequent urination to the extent that she is required to get up at night as often as ten or fifteen times; that, prior to being struck, she had never suffered any kidney disorder and she had never been bothered by frequent urination; that she had not suffered any pain or injury to her back previous to being struck; that her natural rest and sleep are impaired; that she suffers constant pain in her right side where the truck struck her; that she is weak; that she, at the time she was struck, was thirty years of age and for nine years had been doing all kinds of housework; that, prior to the time she was struck, she had contracted an infection of the blood and had received treatment therefor from Dr. Guggenheim at the city hospital. The evidence, however, is such as to show that, independent of any pre-existing condition, plaintiff suffered definite injuries to the muscles of her back and to the muscles of her side where the truck struck her and to her kidneys by reason of being struck by the truck, on the occasion complained of.

The jury unanimously returned a verdict of $1500, which was approved by the trial court. We are not prepared to say, from the evidence in the record, that such verdict was excessive. Upon the other hand, we think it justified thereby.

11. Defendant next complains of instruction B given for plaintiff, relating to the measure of damages. Instruction B is as follows:

"The court instructs the jury that if you find the issues in favor of the plaintiff, in assessing her damages, if any, you may allow her such a sum, if any, as in the judgment of the jury under all the circumstances and evidence you believe and find from the evidence in this case will fairly and reasonably compensate her for the injuries and disabilities, if any, which she has sustained or suffered as a direct result of the collision in question and in determining such amount, if any, you may take into consideration the nature, character and extent of plaintiff's injuries, if any, and whether or not any of said injuries are reasonably certain to be permanent."

Defendant contends that, by such instruction, the jury was authorized to take into consideration circumstances and evidence having no bearing thereon, in assessing plaintiff's damages and the amount thereof—for instance, that it was told that it should take into consideration the fact that plaintiff had been in poor health and had suffered disabilities for two years; that she was separated from her husband and compelled to support herself; that defendant was protected by insurance; that this was a contest between an individual and a corporation and the corporation was well able to pay a verdict of $1500.

The instruction is not open to the complaint made. [Macklin v. Fogel Construction Co., 326 Mo. 38, 31 S. W. (2d) 14.]

The words "under all the circumstances and evidence" used in the instruction refer to the circumstances and evidence bearing on plaintiff's injuries and disabilities sustained as a result of being struck by defendant's truck and the damages and the amount thereof to which she was entitled on such account. That they had such reference and such reference only is apparent from the face of the instruction. They could not be held to have referred to anything else.

12. Defendant next complains that the verdict of the jury is the result of passion and prejudice. This complaint appears to be predicated largely on the claims (1) that there was no sufficient evidence to support the verdict and (2) that the jury was influenced against defendant by the prejudicial remarks of plaintiff's counsel during the trial and upon the argument, to the effect that an insurance company was interested in the defense, and by the questions asked upon the examination of witnesses with reference to said company and its activities.

That there is sufficient evidence to support the verdict has been disposed of adversely to defendant's contention by what has been said in the preceding paragraphs of this opinion.

That an insurance company was interested in the defense seems to have been repeatedly called to the attention of the court and the jury by counsel for both parties in the examination of witnesses and in the argument on the trial without any objection or exception being made thereto by either party. Defendant, having tried the cause upon the theory that it was proper to inject the issue of an insurance com-

pany being interested in the defense, cannot now complain; and, if the jury was influenced thereby, which does not appear, defendant is *particeps criminis* and is to be held equally responsible therefor with plaintiff and, under such circumstances, has no relief.

However, it does not appear that the verdict is excessive. There is sufficient evidence for its support in the full amount thereof.

So far as can be judged from the record, the verdict is the result of an unbiased, frank, fair, and intelligent consideration of the evidence in the record touching plaintiff's injuries and the extent and permanency thereof, uninfluenced by the fact that an insurance company might be ultimately required to pay it.

Defendant's complaint under this head must be denied.

13. Defendant's final contention relates to the exclusion by the trial court of the testimony of one Hart Dickinson, the husband of plaintiff, offered by defendant, concerning alleged statements made by plaintiff to the said Hart Dickinson in conversations with him concerning her alleged injuries and matters that happened on the occasion of their occurrence, tending to show that she was attempting to commit a fraud and was seeking to recover damages from defendant for injuries she had received not by reason of anything done by defendant but for a condition she had suffered from for years, with which defendant had nothing to do, in contradiction of plaintiff on the trial, and tending to show that she was intending to make her case by perjured testimony. It is unnecessary to set out the rejected offer of proof made by defendant. The character of such offer and the proof tendered fully appear from the above statement. The testimony sought to be elicited and the offer of proof made were properly rejected by the trial court, and the testimony sought to be introduced was properly excluded.

At common law, the husband and wife were disqualified as witnesses to give in evidence any communication which occurred in the course of a conversation between the two outside the prseence of others, without the consent of the party against whom it was given. In the evolution of things, such rule has not been changed but remains in full force in Missouri. [Hughes v. Renshaw, 314 Mo. 95, l. c. 118, 282 S. W. 1014.] The rule at common law extends to the disqualification of the husband and wife, the one as a witness for or against the other, to the extent of excluding the testimony of the one for or against the other under most, if not all, circumstances. Our statutes, from time to time, have largely abolished the common law and reconstructed the rule relating to such evidence upon modern lines; but the one landmark remains through varied experiences that any married man, while the relation of marriage exists or subsequently, shall not be permitted to testify to any admissions or statements or confidential communication of his wife made to him, thus, as a matter of public policy, exalting the importance of the maintenance of the marriage

relation as one of sanctity and one to be preserved and removed from dissolution by reason of unnecessary discord as far as possible. [Section 1728, R. S. 1929.]

By the term ''confidential communication between husband and wife'' is meant such communications as pass between them when alone. [Long v. Martin, 152 Mo. 668, 54 S. W. 473; Tucker v. Tucker, 224 Mo. App. 669, 31 S. W. (2d) 238.]

The reason for the rule disqualifying a husband from testifying as to conversations with his wife and *vice versa* (the wife from testifying as to conversations with the husband) is a sound one and springs from the recognition of the fact that marriage bonds are to be protected and not disrupted by a compulsory making known of matters induced by the relation and confided by one spouse to the other under the marriage relation. A wife trusts in the affection and loyalty of her husband and a husband in the affection and loyalty of his wife. It could not be otherwise and the marriage relationship exist in its full blossom and flower. Induced by such relationship, the wife confides to the husband her most secret thoughts, and likewise the husband in her, which thoughts under no circumstances would be revealed to others. The mainspring to such action is the confidence the one bestows on the other and the confidential nature of the relationship between the two. As a matter of public policy, such confidence should be unrestrained and interference therewith prohibited.

Defendant contends that no privilege extends, either at common law or under the statute, to any communication between the two which tends to show an intention by the one or the other to commit a fraud or a criminal offense but that, as to such a communication, the veil of secrecy is lifted and disqualification of the one to testify as to statements by the other is removed. This is a mere intellectual fiction. There is nothing in the law to justify such contention.

The case of Gebhardt v. United Railways Company of St. Louis (Mo.), 220 S. W. 677, is cited. This case refers to confidential communications between a client and an attorney and rightly holds that the privilege of confidence is not afforded a client who seeks the advice of his attorney as to how to accomplish an illegal undertaking. The privilege of confidence under such relationship extends only to cover communications seeking advice as to lawful procedure in the accomplishment of lawful matters in a lawful manner. An attorney's office is not a haven for criminals seeking to find ways in which to accomplish criminal or fraudulent undertakings.

A reading of the statutes relating to persons incompetent to testify wherein attorneys are mentioned as witnesses incompetent to testify concerning communications made to them by their clients in that relation or the advices given by them thereon, demonstrates that such relationship is not on a par with the relationship of husband and wife.

By that section, privilege extends to the attorney only in connection with communications made to him in his relation as an attorney (that is, communications in which advice is sought in matters not involving fraud and illegal, corrupt, or criminal conduct and the like) while, in the matter of a husband and wife, no restrictions are imposed as to the character of the communications or the matters related in the conversations, whether they relate to an intention to commit a fraud or a criminal offense or other matters. There are no restrictions imposed upon the character of the conversation in the relationship of husband and wife, and no exceptions spring therefrom.

Defendant cites the case of Henry v. Sneed, 99 Mo. 407, 12 S. W. 663, in favor of its contention. Such case is, however, no authority for the contention of defendant herein. That was a case to enjoin the enforcement of a deed of trust upon the wife's land, which deed of trust she had been induced to execute in behalf of her husband to secure a note given by him in a transaction induced by fraud. It was there held that the husband was used as a conduit, through which the fraud-feasors operated to induce the wife against her will to execute the deed of trust; that the conversations between the husband and wife, reflecting the efforts of the tort-feasors bringing about the execution of the deed of trust, were part of the *res gestae* and, in such respect, sustained a different attitude from the ordinary confidential communications between husband and wife and were to be regarded as sustaining a different attitude; and that the testimony of both husband and wife was competent as to such conversation in equity *ex necessitate rei*.

The case at bar is not that case. This is a law case pure and simple; and no rule in equity is involved; and the husband offered as a witness against the plaintiff had not been used in any sense as a conduit, by which to work a fraud upon plaintiff or as a conduit through which she had practiced a fraud upon defendant. Neither did the conversations, proof of which was offered, constitute any part of the *res gestae* connected with plaintiff's injuries and cause of action therefor. There is no merit in defendant's contention. The evidence was not admissible.

There is a question raised by plaintiff as to whether defendant properly raised any objection to the exclusion of such testimony in its motion for a new trial. While not committing ourselves upon the propositions involved in the question raised by plaintiff in such regard, we treat the matter as if the proper objection to the exclusion of the evidence offered was made by defendant.

We have disposed of all the assignments of error, points, and complaints made by defendant, adversely to its contentions. The case was well tried, and the verdict and the judgment were for the right party.

The judgment of the trial court is affirmed. All concur.